IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JENNIFER COX,**                                        Case 5:14 CV 2233

     Plaintiff,

     v.                                        Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                                        MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Jennifer Cox ("Plaintiff") filed a complaint against Carolyn W. Colvin, in her capacity as Commissioner of Social Security ("Commissioner"), seeking judicial review of the Commissioner's decision to deny Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 405(g). (Doc. 1). The parties consented to the jurisdiction of the undersigned in accordance with 28 U.S.C. § 636(c) and Local Rule 72.2(b)(1). (Doc. 14). For the following reasons, the Commissioner's decision is affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB on May 10, 2011, alleging impairments of severe anxiety and depression. (Tr. 83). She alleged a disability onset date of April 30, 2011, and a date last insured ("DLI") of December 31, 2015. (Tr. 83). Social Security denied Plaintiff's claim both initially (Tr. 93) and upon reconsideration (Tr. 107). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on March 19, 2012. (Tr. 124).

The ALJ conducted a hearing on April 15, 2013, at which Plaintiff, represented by counsel, and a Vocational Expert ("VE") testified. (Tr. 35).

**FACTUAL AND MEDICAL BACKGROUND**

*Personal Background*

Plaintiff's date of birth is April 1, 1979, making her 32 years old on April 30, 2011, her alleged onset date of disability. (Tr. 83). At the hearing, Plaintiff testified she was married with five children, two of whom lived with her full-time. (Tr. 41). In order to support the household, her husband worked odd jobs and they received family support. (Tr. 42). Plaintiff completed high school, but did not receive a diploma due to her inability to pass the math proficiency test. (Tr. 43). She has past work experience as a flagger, cleaner (housekeeping), cashier-checker, and parking lot attendant. (Tr. 71).

*Hearing Testimony*

Plaintiff testified she last worked in late 2010 or early 2011 as a flagger. (Tr. 43). She reported suffering from anxiety since age fourteen and struggling with activities of daily living her whole life, with exacerbated symptoms three years prior. (Tr. 48). She had difficulty leaving home alone, and at one point alleged staying home for an entire year during which time she became "borderline anorexic." (Tr. 49-50). She attended her children's softball games. (Tr. 69). She reported nervousness, difficulty concentrating, and difficulty working with customers due to an inability to manage criticism. (Tr. 58, 47).

Plaintiff also testified she had "fibromyalgia" and pain throughout her body. (Tr. 44, 51). She reported numbness, tingling, and puffiness in her hands; swollen ankles and fingers; aches in her elbows; and pain in her kneecaps, hips, and back. (Tr. 52). Plaintiff testified to an inability to go up and down the stairs with laundry baskets, but did have the ability to pick up her children's toys. (Tr. 60). She reported an inability to pick up her six-year-old son, whom she estimated to weigh 48 pounds, and could only hold a cell phone for a short period of time before numbness

2

caused her to drop the phone. (Tr. 59). She required assistance grocery shopping due to pain (Tr. 51), but could lift light grocery bags (Tr. 62). She could walk for an hour before needing to sit down and take a break (Tr. 60), and had difficulty sleeping (Tr. 63-64). She could not stand for very long due to swelling and pain in her feet. (Tr. 60). Plaintiff testified to an inability to reach over her head or do laundry, and required assistance with cleaning. (Tr. 61).

Plaintiff's husband, Christopher Cox, also testified at the hearing. (Tr. 65). Mr. Cox testified to her inability to leave home by herself (Tr. 65) and frequent "panic attacks" (Tr. 66-67). He performed most of the household chores himself. (Tr. 66).

The VE testified Plaintiff's past work fell into the following categories: flagger, cleaner (housekeeping), cashier-checker, and parking lot attendant. (Tr. 71). The ALJ presented the VE with the following three hypothetical individuals and asked about his or her ability to perform work.

First, the ALJ asked the VE if a hypothetical person who could perform a range of medium work; frequently climb ramps and stairs; occasionally climb ropes, ladders, and scaffolds; frequently balance, stoop, kneel, crouch, and crawl; had mental limitations of simple routine and repetitive tasks; a low production rate pace or quota; simple work-related decision making; occasional contact with supervisors and coworkers with limited cooperative tasks; infrequent and superficial contact with the public; and a low stress work environment including infrequent changes which are gradually introduced, could perform any of Plaintiff's past jobs. (Tr. 72). The VE opined the hypothetical person could perform the cleaner (housekeeping) job, parking lot attendant job, and the flagger job. (Tr. 72). Additionally, the VE determined the hypothetical person would be able to perform other jobs including, but not limited to, cleaner (laboratory equipment), cleaner (hospital), and automobile detailer. (Tr. 72-73). Plaintiff, through

counsel, added an additional limitation to this hypothetical person of an inability to be away from home alone and the need for someone to stay with her at work. (Tr. 76). The VE opined this limitation would preclude work because it would be considered a special accommodation. (Tr. 76). Alternatively, Plaintiff asked if the first hypothetical person would be able to work if he or she also needed an additional twenty minute break in the morning and again in the afternoon. The VE opined this person would be precluded from work unless a special accommodation occurred. (Tr. 77-78).

Second, the ALJ presented the VE with a hypothetical person with all of the above limitations, but who is limited to a range of light work. The VE opined this person could perform all the past work, including the flagger job as it is defined in the Dictionary of Occupational Titles ("DOT"). (Tr. 73). The VE noted there would be other positions this hypothetical person could perform, including mail clerk, photocopying machine operator, and office helper. (Tr. 74).

Third, the ALJ presented the VE with a hypothetical person who would be off-task more than twenty percent of the workday because of an inability to maintain concentration, persistence, and pace, or may miss more than two days per month because of illness. (Tr. 74-75). The VE opined this person would not be able to maintain any type of full-time employment. (Tr. 75).

### *ALJ Decision*

On May 24, 2013, the ALJ issued an unfavorable Notice of Decision. (Tr. 11). The ALJ determined Plaintiff had the following severe impairments: panic disorder with agoraphobia, adjustment disorder with depressed mood, neuropathic pain, and obesity. (Tr. 16). She did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix. (Tr. 16-17). After a

review of the record, the ALJ determined Plaintiff had the residual functional capacity to perform light work except that she could occasionally climb ladders, ropes and scaffolds; frequently climb stairs and ramps; frequently balance, stoop, kneel, crouch, and crawl; perform simple, repetitive, routine tasks with a low production rate pace/quota, and simple decision-making; have occasional contact with co-workers and supervisors with limited cooperative tasks; have infrequent and superficial contact with the public; and work in a low stress environment with infrequent changes gradually introduced. (Tr. 18).

On August 8, 2014, the Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 CFR §§ 404.955, 404.981. Plaintiff filed the instant action on October 7, 2014. (Doc. 1).

### Relevant Physical Medical Evidence[1]

Plaintiff presented to John Sassano, D.O. on May 16, 2011, alleging mild to moderate muscle pain and fatigue. (Tr. 263). In regard to the muscle pain, pertinent negatives included no radiation, bruising, crepitus, decreased mobility, difficulty sleeping, instability, limping, locking, night pain, night-time awakening, numbness, popping, spasms, swelling, tingling in arms or legs, or tenderness. (Tr. 263). Dr. Sassano also noted there were no depression symptoms. (Tr. 263). A physical examination did not reveal any abnormalities, but Dr. Sassano assessed Plaintiff with malaise, fatigue, and "Anxiety State Nec". (Tr. 265).

Two days later Plaintiff presented to the emergency room after falling at home and injuring her back. (Tr. 308). The emergency room physician noted Plaintiff had no history of chronic back pain. (Tr. 308). Normal x-rays of the lumbosacral and thoracic spine resulted in

---

1. Plaintiff submitted evidence before the alleged onset date of disability. (Doc. 15, at 4-5). Eligibility for DIB, however, must be established during the relevant time period; therefore, medical evidence submitted before the alleged onset date is of little relevance and not discussed herein.

Plaintiff's discharge. (Tr. 309). Plaintiff returned to the emergency room the following day with complaints of headache, weakness, and constipation. (Tr. 305). She had started taking Cymbalta that morning. (Tr. 305). Notwithstanding some anxious behavior, all medical tests produced normal results, so the emergency room doctor prescribed Tylenol and discharged Plaintiff with diagnoses of cephalgia and constipation. (Tr. 305-06).

Plaintiff again returned to the hospital a few days later, on May 21, 2011, with myriad complaints, including: fatigue, stiffness, lack of energy, anxiousness, hair loss, a raspy voice, and swollen, cold feet. (Tr. 299). She reported another doctor sent her to the emergency room, however, that doctor advised her only to report to the emergency room if "she had any extreme symptoms". (Tr. 299). In the absence of such symptoms, the emergency room doctor discharged Plaintiff with diagnoses of myalgia and malaise. (Tr. 299-300). The next month Plaintiff again presented to the emergency room complaining of congestion and back pain. (Tr. 292). All medical tests were largely normal and the emergency room doctor discharged Plaintiff with diagnoses of flank and back pain, and an upper respiratory infection with sinus headache. (Tr. 292).

In September 2011, a state agency consultant reviewed Plaintiff's medical records and determined she could occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; stand, walk, and sit for six hours in an eight hour work day; and push and pull without limitation. (Tr. 88-89). A second state agency consultant reviewed Plaintiff's medical records in January 2012 and affirmed the findings. (Tr. 102-03).

At an appointment on August 16, 2012, for allergies, Suman C. Vellanki, M.D. noted Plaintiff's ability to perform usual activities due to her general state of good health and lack of

fatigue. (Tr. 353). Dr. Vellanki also noted Plaintiff's normal affect, good eye contact, and appropriate mood and affect. (Tr. 354).

In January 2013, Plaintiff presented to Mathew Murikan, M.D. for "[s]ocial sec. paperwork" and complained of pain all over her body with tingling and numbness in all extremities. (Tr. 351). The cause of Plaintiff's neuropathic pain was unclear because while Plaintiff had "findings consistent with fibromyalgia [she] failed outpatient treatment with Cymbalta." (Tr. 351). Dr. Murikan opined claimant had four out of eleven pinpoint tenderness sites, consistent with fibromyalgia. (Tr. 352).

The following month Plaintiff sought treatment of her neuropathic pain, although she reported greatly reduced pain with medication. (Tr. 349). Dr. Vellanki assessed Plaintiff with neuropathic pain, rather than fibromyalgia, even though she had four out of eleven pin point tenderness sites which were consistent with fibromyalgia. (Tr. 349).

Four days after the ALJ hearing, on April 19, 2013, Plaintiff presented to Dr. Murikan "to assess which trigger points were affected for her fibromyalgia." (Tr. 380). Dr. Murikan circled eighteen affected trigger points tender to palpation on a diagram of the human body. (Tr. 381). While it is not a diagnosis, this appears to be the first time in the record a doctor suggests Plaintiff may in fact have fibromyalgia rather than neuropathic pain.

***Relevant Mental Medical Evidence***

In June 2011, Abdon Villalba, M.D. responded to the Social Security Administration's request for medical information regarding Plaintiff. (Tr. 321). The record reveals Plaintiff first saw Dr. Villalba approximately one month earlier, on May 10, 2011. He noted, however, she had "panic attacks since age 14", "chronic anxiety", and a "[history] of periodic withdrawal, seclusion". (Tr. 322). He also noted she had "multiple interests related in caring for her young 5

7

children" and her symptoms had responded to treatment. (Tr. 322-23). Dr. Villalba diagnosed claimant with "Generalized Anxiety Disorder with depression, OCD" and noted her "ability to tolerate stress, daily routine stressors is decreasing". (Tr. 323). That same month, however, Dr. Villalba listed Plaintiff's status as "improving" with treatment. (Tr. 345).

Joshua Magleby, Ph.D., a clinical neuropsychologist, conducted a consultative psychological exam in August 2011 at the request of the Ohio Division of Disability Determination. (Tr. 324). The record reveals Plaintiff's ability to care for herself, manage money, and perform activities of daily living. (Tr. 326). Dr. Magleby noted Plaintiff's appropriate dress; alertness; proper orientation to person, place, time and situation; appropriate eye contact; normal and upright posture; normal and unencumbered gait; normal thought content; lack of marked confusion; normal rate of speech; good understanding; normal affect; lack of overt signs of anxiety; no evidence of panic disorder; fair mental status; and fair judgment. (Tr. 324-29).

Dr. Magleby assigned a Global Assessment of Functioning ("GAF") score of 50[2] and diagnosed Plaintiff with Panic Disorder with Agoraphobia, Adjustment Disorder with Depressed Mood (chronic), and avoidant, dependent, and obsessive-compulsive traits. (Tr. 328). He concluded Plaintiff demonstrated an ability to understand, remember, and carry out simple oral instructions; maintain attention and concentration; maintain normal persistence and pace; perform multi-step tasks; have normal cognitive function; and have normal social relationships.

---

2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" *Id.* at 34.

(Tr. 329). Plaintiff appeared to have some difficulty in her ability to perform simple, repetitive tasks; relate to others due to anxiety; and withstanding stress and psychological pressures associated with daily work activities. (Tr. 329).

Also in August 2011, state agency psychologist Dr. Roseann Umana, Ph.D. opined Plaintiff had affective and anxiety-related disorders (Tr. 86-87), and demonstrated moderate difficulties in activities of daily living, maintaining social functioning, concentration, persistence, or pace (Tr. 87). Plaintiff had no repeated episodes of decompensation. (Tr. 87). In January 2012, state agency psychologist Aracelis Rivera, Psy.D. reviewed Plaintiff's medical records and affirmed the findings. (Tr. 101).

Plaintiff continued treatment with Dr. Villalba, and the notes from these visits largely reveal Plaintiff's "stable" or "improving" progress with treatment (Tr. 340, 341, 343, 344, 345, 357, 358, 359, 360, 361, 362, 363, 364, 365, 366, 367, 368, 370, 373, 374, 376); with the exception of one appointment on October 20, 2011, in which her condition was "deteriorating" (Tr. 342).

Following this treatment, Dr. Villalba completed a medical source statement in April 2013. (Tr. 377). He opined Plaintiff had "extreme loss"[3] in her ability to maintain concentration and attention for extended periods of two hour segments, and her ability to work in coordination with, or proximity to, others without being unduly distracted by them; "marked loss"[4] in her ability to remember work-like procedures, understand and remember very short and simple instructions, perform activities within a schedule, maintain regular attendance and punctuality, sustain an ordinary routine without special supervision, complete a normal workday and work

3. "Extreme loss" is defined as a complete loss of ability in the named activity resulting in an inability to sustain performance during an eight hour work day. (Tr. 377).
4. "Marked loss" is defined as a substantial loss of ability in the named activity in which an individual can sustain performance only up to a third of an eight hour work day. (Tr. 377).

week without interruptions, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and respond appropriately to changes in a routine work setting; a "moderate loss"[5] in her ability to carry out very short and simple instructions, make simple work-related decisions, and in her awareness of normal hazards and ability to take appropriate precautions; and "[n]o/mild loss"[6] in her ability to ask simple questions or request assistance. (Tr. 377).

Additionally, Dr. Villalba indicated Plaintiff had three or more episodes of decompensation within twelve months (each at least two weeks long), a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would cause her to decompensate, and a history of inability to function outside a highly supportive living arrangement for one or more years, with a need to continue such arrangement. (Tr. 378).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings

---

5. "Moderate loss" is defined as some loss of ability in the named activity, but an individual can still sustain performance for one third up to two thirds of an eight hour work day. (Tr. 377).
6. "No/mild loss" means no significant loss of ability in the named activity, and one can sustain performance for two thirds or more of an eight hour work day. (Tr. 377).

"as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's RFC and can claimant perform past relevant work?

5.  Can claimant do any other work considering her RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national

economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff asserts reversal or remand is proper in this case because the ALJ: (1) violated the treating physician rule; (2) made an incorrect fibromyalgia assessment; (3) failed to include all of Plaintiff's limitations in hypothetical questions to the VE; and (4) improperly evaluated the credibility of the witnesses. (Doc. 15, at 16-24). Each of these assignments of error fail for the following reasons.

### *Treating Physician Rule*

Plaintiff argues the ALJ's decision should be vacated because the ALJ violated the treating physician rule by failing to provide good reasons for giving little weight to the opinion of Plaintiff's treating psychiatrist, Dr. Villalba. (Doc. 15, at 16-21).

Generally, medical opinions of treating physicians are afforded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

The treating source analysis, however, does not begin without the identification of a treating source. Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902. This relationship exists when "medical evidence establishes that [claimant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice". § 404.1502.

If a treating source relationship is established, the opinion of such treating source is usually given deference. *Rogers*, 486 F.3d at 242; *see also* SSR 96-2p. Conversely, the opinions of non-treating sources are not given deference. § 416.927(d)(2); SSR 96-8p. Non-treating sources are physicians, psychologists, or other acceptable medical sources that have examined the claimant but do not have, or did not have, an ongoing treatment relationship with her. § 416.902.

In this case, the ALJ correctly noted that at the time Dr. Villalba completed a form for the Social Security Administration regarding Plaintiff's medical impairments, "Dr. Villalba had been treating the claimant for only slightly more than a month, which was not sufficient time to examine the claimant's longitudinal process." (Tr. 22, 321). Indeed, Dr. Villalba noted he first saw Plaintiff on May 10, 2011, and he completed the form regarding her conditions on June 16, 2011. (Tr. 321). There is substantial evidence to support the ALJ's finding that Dr. Villalba did not have sufficient time to observe and examine Plaintiff's longitudinal progress, and he, therefore, did not qualify as a "treating source" at the time he submitted this opinion. The ALJ was not required to give this opinion controlling weight.

13

Following a period of treating Plaintiff, Dr. Villalba completed a medical source statement regarding Plaintiff's ability to perform unskilled work on April 9, 2013. (Tr. 377). Because he treated Plaintiff for almost two years at this point, Dr. Villalba qualified as a treating physician. A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Rogers*, 486 F.3d at 242. (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

The ALJ must give "good reasons" for not affording controlling weight to the physician's medical opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4).

In her opinion, the ALJ noted Plaintiff underwent a "relatively mild course of therapy, and that increases in medications appeared to be effective in relieving many of [Plaintiff's] psychiatric symptoms (7F/2, 12)." (Tr. 23). She also noted Dr. Villalba's treatment records did

14

not show or support any psychiatric hospitalizations or episodes of decompensation. (Tr. 23). She concluded, therefore, the record did not support the severity of mental health impairments which Dr. Villalba asserted in his medical source statement. (Tr. 23).

A review of the record does not reveal any hospitalizations for mental health treatments. (Tr. 357-76). The record shows that with psychiatric medication and therapy, Plaintiff's status was either "stable" or "improving", (Tr. 340, 341, 343, 344, 345, 357, 358, 359, 360, 361, 362, 363, 364, 365, 366, 367, 368, 370, 373, 374, 376), with the exception of one occasion in which she was "deteriorating" (Tr. 342). For nearly two years Dr. Villalba stabilized Plaintiff's mental health issues with medication and therapy, without a need for hospitalization or more radical therapy. There is substantial evidence in the record to support the ALJ's finding that Dr. Villalba's treatment notes are inconsistent with his opinion in the medical source statement. (Tr. 23).

Plaintiff also argues "[t]he ALJ erred by 'telescoping' the two-step analysis discussed in [*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013)] into one step only." (Doc. 15, at 18). The first "step" being "(1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). And the second "step" the requirement that after an ALJ determines a treating physician's opinion will not receive controlling weight, he or she must weigh the opinion "based on the length, frequency, nature, and extent of the treatment relationship…". *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). Specifically, Plaintiff argues the ALJ erred by failing to provide good reasons why the opinion was not "'well-supported by medically acceptable clinical and laboratory diagnostic techniques." (Doc. 15, at 18). When an ALJ determines a

treating physician's opinion is not entitled to controlling weight, he must provide specific evidentiary support to refute *either* the opinion's objective basis or its consistency with other record evidence. *Gayheart,* 710 F.3d at 376-77 (emphasis added).

This case is distinguished from *Gayheart* because unlike in *Gayheart*, here, the ALJ did provide good reasons for not giving controlling weight to Dr. Villalba's medical source statement. *Gayheart* does not require an ALJ give good reasons as to why each specific condition is not met, but rather only requires good reasons as to why controlling weight is not warranted. Plaintiff's argument that the ALJ erred by failing to provide good reasons why the opinion was not "'well-supported by medically acceptable clinical and laboratory diagnostic techniques" fails because the ALJ established the opinion did not meet the other required condition, i.e. consistency.

Thus, the ALJ did not err by not giving controlling weight to Dr. Villalba's opinion. In regard to Plaintiff's mental impairments, Dr. Villalba was her treating physician and so his records constitute a large portion of substantial evidence in the record. The ALJ reviewed these records, and the entire record, and determined his medical source statement was inconsistent with the record. The ALJ is required to give "good reasons" as to the lack of controlling weight she afforded to the treating physician's opinion and she has done so by showing the opinion is inconsistent with other substantial evidence in the record. The ALJ next determined Dr. Villalba's opinion would be given "little weight" and she based this on her determination that his opinion is inconsistent with his own treatment record. (Tr. 23).

### *Fibromyalgia Assessment*

Plaintiff next argues the ALJ erred by failing to properly discuss whether Plaintiff's condition was medically equivalent to Listing 14.09(D), Inflammatory Arthritis which, she

16

alleges, is required by SSR 12-2p. (Doc. 15, at 21-22). Plaintiff fails to note, however, that SSR 12-2p first requires a *diagnosis* of fibromyalgia by a physician. ("What specific criteria can establish that a person has an [medically determinable impairment "MDI"] of [fibromyalgia "FM"]? We will find that a person has an MDI of FM if the physician *diagnosed* FM and provides [additional medical evidence])". SSR 12-2p (II) (emphasis added).

Fibromyalgia is a condition "marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers*, 486 F.3d at 244 n.3 (quoting *Stedman's Med. Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005)). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). "[P]hysical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion". *Preston*, 854 F.2d at 818.

It is up to a medical doctor, however, and not the ALJ, to make a diagnosis of fibromyalgia. (Tr. 21). Plaintiff cites to numerous normal or unremarkable medical tests in her brief, in order to demonstrate her alleged fibromyalgia diagnosis. (Doc. 15, at 5-6). As of the date of hearing, however, Plaintiff did not have a fibromyalgia diagnosis.

Therefore, without a fibromyalgia diagnosis SSR 12-2p does not apply. In fact the rule states when it cannot be found "the person has an MDI of FM but there is evidence of another MDI, we will not evaluate the impairment under this Ruling. Instead, we will evaluate it under

the rules that apply for that impairment." SSR 12-2p (II). In this case, the ALJ appropriately analyzed the listings for the conditions Plaintiff did have.

The ALJ noted "[a]lthough there is no specific listing for fibromyalgia and other generalized pain disorders such [as] neuropathy, [she] reviewed all listings associated with pain in the joints…". (Tr. 17). An ALJ must first find a severe impairment before analyzing whether it meets a specific listing. 20 C.F.R. § 404.1520. The ALJ did find neuropathic pain as a severe impairment and properly analyzed it under all listings associated with pain, specifically, 1.02A, Major Dysfunction of a Joint and 11.14, Peripheral Neuropathies; and found neither was met in this instance.

Four days *after* the hearing, on April 19, 2013, Plaintiff presented to Dr. Murikan "to assess which trigger points were affected *for her fibromyalgia*." (Tr. 380) (emphasis added). This appears to be the first time in the record a doctor suggests Plaintiff may in fact have fibromyalgia rather than neuropathic pain, but he does not outright diagnose her with the condition.

As such, Plaintiff did not have a diagnosis of fibromyalgia that is pertinent to this Court's review of the ALJ decision. The ALJ's decision was issued on May 24, 2013. The Appeals Council denied Plaintiff's request for review on August 8, 2014. (Tr. 1). "[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

As Plaintiff points out elsewhere in her brief, "ALJ's should not be allowed to 'play doctor' by interpreting data from treating source medical records." *Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006). The ALJ reviewed the record and found neuropathic pain as a

18

severe impairment, and generously, and without diagnosis, also listed fibromyalgia as a non-severe impairment due to indications of the condition in the record.

Here, Plaintiff did not have a diagnosis of fibromyalgia and the ALJ was not required to analyze this alleged condition under any specific listing. Even without a diagnosis the ALJ considered fibromyalgia as a non-severe impairment. Furthermore, as the Commissioner correctly asserts, "nowhere does SSR 12-2p state that an ALJ must analyze fibromyalgia under a specific listing." (Doc. 16, at 11).

Furthermore, in her brief to the Court, Plaintiff failed to provide evidence as to why her condition meets listing 14.09(D). (Doc. 15, at 21-22). It is Plaintiff's burden to show her impairment[s] met or equaled one of the listed impairments. *Walters*, 127 F.3d at 529. In a post-hearing memorandum, however, dated April 19, 2013, Plaintiff argued her "*[f]ibromyalgia…* and her severe mental disorders, at least equal the severity level of Listing 14.09(D), Inflammatory Arthritis." (Tr. 248) (emphasis added).

A plaintiff can demonstrate she is disabled by presenting "medical findings *equal in severity to all the criteria* for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis added); 20 C.F.R. § 404.1526(a). "Medical equivalence must be based on medical findings" and "must be supported by medically acceptable clinical and laboratory diagnostic techniques." §404.1526(a). In order to determine whether a plaintiff's impairments are medically equivalent to a listing, the ALJ may consider all evidence in a plaintiff's record. § 404.1526(c).

To ensure Plaintiff a thorough and complete review, this Court considers the requirements of section 14.09(D):

Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
1.  Limitation of activities of daily living.
2.  Limitation in maintaining social functioning.
3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

In her post-hearing brief, Plaintiff noted the limitation of her daily activities due to pain, chronic fatigue, and statements from her husband and friend regarding these conditions. (Tr. 249). This evidence is insufficient. Plaintiff failed to demonstrate "[r]epeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)". Even though the ALJ was not required to consider 14.09(D), this Court has, and finds that the requirements are not met, and thus, the ALJ did not err by failing to consider it.

### Examination of the VE

Plaintiff next argues the ALJ's decision should be vacated or remanded because the hypothetical questions to the VE failed to contain all of her limitations. (Doc. 15, at 22). She states the hypothetical question posed to the VE at the hearing failed to include "an assumption regarding the need for extra breaks." (Doc. 15, at 23). In support of her argument she notes Dr. Villalba's medical source statement; however, this opinion was not given controlling weight by the ALJ. (Tr. 377).

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. *Id.* § 416.929. An ALJ must also consider and weigh medical opinions. *Id.* § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must

make a finding regarding the credibility of the statements based on a consideration of the entire record. Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *1.

Frequently ALJs pose hypothetical questions to VEs in order to determine whether a claimant's RFC allows them to work other jobs. Typically this is done to meet the Commissioner's burden under Step Five of the disability analysis. Here, however, since the ALJ determined Plaintiff was able to perform her past relevant work the disability analysis ended at Step Four, and no testimony from the VE about other jobs Plaintiff could perform was even necessary. Step Five is not reached when a plaintiff cannot meet her burden at Step Four:

> The sequential evaluation process is a series of five "steps" that we follow in a set order. If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step. If we cannot find that you are disabled or not disabled at a step, we go on to the next step. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your relevant work. If you can still do your past relevant work, we will find that you are not disabled.

20 C.F.R. § 404.1520(a)(4). When a plaintiff is capable of performing her past relevant work, the Commissioner need not prove she is incapable of performing other jobs in the economy in order to make a finding of not disabled.

Here, even though the ALJ determined Plaintiff could continue to perform past work of housekeeping cleaner, parking lot attendant, and flagger (Tr. 23), she nevertheless, continued her analysis to Step Five and determined Plaintiff's capability to perform other jobs existing in the national economy as well. (Tr. 23-25).

The ALJ limited Plaintiff to "simple, repetitive, routine tasks, with a low production rate pace/quota, and simple decision making", "occasional contact with co-workers and supervisors with limited cooperative tasks, and infrequent and superficial contact with the public", and a low stress work environment "with infrequent changes gradually introduced." (Tr. 18). This

limitation adequately accounts for Plaintiff's moderate limitation in concentration, persistence or pace, and is supported by substantial evidence. (Tr. 18, 21). This limitation is consistent with the record, and Plaintiff's testimony that she has difficulty with anxiety and interaction with others. (Tr. 47, 48, 58, 265, 323). This limitation is also consistent with the state agency consultant's determination that Plaintiff had some impairment in her ability to perform simple and repetitive tasks, relate to others due to anxiety, and withstand stress and psychological pressures associated with daily work activities. (Tr. 329). The state agency reviewers determined Plaintiff had moderate limitations in concentration, persistence or pace (Tr. 86-87), therefore, the ALJ's determination is supported by substantial evidence.

### Credibility of the Witnesses

Plaintiff also argues for reversal of the ALJ's ruling due to an alleged improper credibility evaluation of the witnesses. (Doc. 15, at 23-24). In the Sixth Circuit, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources'". *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). While the ALJ "does not have a heightened duty of articulation when addressing opinions issued by 'other sources'", the ALJ must nevertheless consider those opinions. *Hatley v. Comm'r of Soc. Sec.*, 2014 WL 3670078 (N.D. Ohio); *see also Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-3p does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'").

Plaintiff is correct in her assertion that "the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's

credibility'", however, that is not what happened here. (Doc. 15, at 23); *Rogers*, 486 F.3d at 247

(citing SSR 96-7p).

Here, the ALJ considered third-party statements of Plaintiff's husband and friend and

determined significant weight could not be assigned for the following reasons:

> The claimant's friend, Debbie Eckhardt, does not establish that the claimant is
> disabled (18E). Since Ms. Eckhardt is not medically trained to make exacting
> observations as to dates, frequencies, types and degrees of medical signs and
> symptoms, or of the frequency or intensity of unusual moods or mannerisms, the
> accuracy of the testimony is questionable. Moreover, by virtue of the relationship
> as a friend of the claimant, the witness cannot be considered a disinterested third
> party witness whose testimony would not tend to be colored by affection for the
> claimant and a natural tendency to agree with the symptoms and limitations the
> claimant alleges. Likewise, the testimony of the claimant's husband has been
> considered. However, he too, has a personal relationship with the claimant, is not
> qualified to render a medical assessment and cannot be considered as an
> independent 3rd party source. Most importantly, significant weight cannot be
> given to the witness's testimony because it, like the claimant's, is simply not
> consistent with the preponderance of the opinions and observations by medical
> doctors in this case.

(Tr. 22).

The ALJ determined, among other reasons, that these witnesses were not qualified to

render a medical assessment, and that is not intangible or intuitive, it is fact. On review, the

Court is to "accord the ALJ's determinations of credibility great weight and deference

particularly since the ALJ has the opportunity, which we do not, of observing a witness's

demeanor while testifying." *Jones*, 336 F.3d at 476. Still, an ALJ's decision to discount a

claimant's credibility "must contain specific reasons for the finding on credibility, supported by

the evidence in the case record, and must be sufficiently specific to make clear to the individual

and to any subsequent reviewers the weight the adjudicator gave to the individual's statements

and the reasons for that weight." SSR 96-7p, 1996 WL 374186, *2. In reviewing an ALJ's

credibility determination, the Court is "limited to evaluating whether or not the ALJ's

explanations for partially discrediting [the witness] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. The ALJ provided specific reasons she did not afford significant weight to testimony from Plaintiff's husband and friend. This Court finds the ALJ's credibility determination of the witnesses both reasonable and supported by substantial evidence. This assignment of error fails.

### CONCLUSION

Following a review of the arguments presented, the record, and the applicable law, this Court finds the ALJ's decision is supported by substantial evidence and resulted from application of the correct legal standards. The Court, therefore, affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

s/James R. Knepp II
United States Magistrate Judge
